***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and oral arguments before the Full Commission. Regarding their appeal, defendants have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the prior Opinion and Award. Regarding his appeal, plaintiff has in part shown good grounds to reconsider the evidence. Accordingly, the Full Commission MODIFIES IN PART the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** *Page 2 ISSUES TO BE DETERMINED
1. Whether plaintiff is entitled to additional medical treatment for his compensable back and left leg conditions?
2. Whether plaintiff's psychological condition is compensable?
3. To what additional indemnity compensation, if any, is plaintiff entitled?
4. Whether plaintiff is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.?
 *********** DEPOSITIONS
1. The deposition of Dr. Joseph R. Mazzaglia has been admitted into the record.
2. The deposition of Dr. Alfred L. Rhyne, III has been admitted into the record.
3. The deposition of Dr. Karla de Beck has been admitted into the record.
 *********** EXHIBITS
1. A Pre-Trial Agreement, which was admitted into the record and marked as Stipulated Exhibit (1).
2. An Indexed Set of Paginated Exhibits, which was admitted into the record and marked as Stipulated Exhibit (2).
3. Plaintiff's Performance Reviews, which were admitted into the record and collectively marked as Defendants' Exhibit (1).
4. Time Line and Notes created by Ms. Kim Williams, which were admitted into the record and collectively marked as Defendants' Exhibit (2). *Page 3 
5. Payroll Records, which were admitted into the record and collectively marked as Defendants' Exhibit (3).
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The Carrier on the risk is Nationwide Mutual Insurance Company.
5. Plaintiff sustained an admittedly compensable injury by accident on 10 August 1990 arising out of and in the course and scope of his employment.
6. An employment relationship existed between plaintiff-employee and defendant-employer on 10 August 1990.
7. Plaintiff's average weekly wage is $496.53, yielding a compensation rate of $331.04.
8. An Opinion and Award was entered by Deputy Commissioner Kim Ledford [formerly Cramer] on 27 June 2001.
9. An Order of Consent Amendment to the Opinion and Award was entered by Deputy Commissioner Ledford on 21 December 2006. *Page 4 
10. Plaintiff filed an Industrial Commission Form 33 Request for Hearing on 31 July 2009 citing "Defendants have refused to pay for medical treatment pay for TTD benefits effective 21 March 2008 where Plaintiff is totally permanently disabled as a result of a burn amputation."
11. Defendants filed an Industrial Commission Form 33R on 4 August 2009 citing "The parties are unable to agree as to whether Plaintiff is entitled to wage loss benefits for his compensable injuries unrelated to his psychological condition which Plaintiff alleges is causally related to such injuries."
 ***********
Based upon the foregoing Stipulations, and the preponderance of the evidence in view of the entire record, the Full Commission enters the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Full Commission, plaintiff was forty-six (46) years of age with his date of birth being 13 April 1965. Plaintiff is a high school graduate.
2. Plaintiff began working for defendant-employer as a lineman on 6 February 1985 when he was nineteen (19) years of age. In that capacity, plaintiff's duties included setting poles, framing poles, changing out poles and hanging transformers.
3. On 10 August 1990, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer when his left shoulder touched a live power line. Following his injury plaintiff was transported by EMS to Anson Community Hospital. From there, plaintiff was then transported to the North Carolina Jaycee Burn Center. *Page 5 
4. Touching the live wire caused plaintiff's shirt to catch fire and burn over twenty-seven percent of his body. Plaintiff underwent multiple surgeries, including the amputation of his right leg above the knee and various debridement procedures to his left shoulder, his right leg and his right groin. Plaintiff was discharged just over a month after being admitted to the Burn Center and was then referred to Carolinas Rehabilitation in Charlotte to be fitted with a prosthetic leg.
5. Plaintiff underwent a Functional Capacity Evaluation, or FCE, on 17 April 1991 and demonstrated the ability to work at a medium-duty level. Additionally, it was noted that plaintiff put forth a maximal effort during the evaluation. It was also noted that plaintiff was unable to return to his former position with defendant-employer as a lineman. Dr. H. D. Peterson, Director of the Burn Center and Professor of Surgery, advised that plaintiff would be limited in his mobility and heavy lifting because of his injuries, and would not be able to climb poles. Nevertheless, plaintiff was initially allowed to attempt a trial return to work for defendant-employer in June 1991.
6. At hearing, Ms. Kim Williams testified on behalf of defendant-employer. Ms. Williams has been employed by defendant-employer for twenty-three (23) years and has been the director of human resources since 1994. Ms. Williams was aware of plaintiff's physical and work restrictions from the time he first returned to work in November 1991. When he did so, plaintiff initially returned as an assistant crew leader, which is similar to being a lineman. That job has heavy lifting requirements associated with it, at times requiring a worker to lift fifty to one hundred (50-100) pounds. As such, the assistant crew leader job was outside of plaintiff's FCE restrictions. However, plaintiff clearly wanted to continue to work as a lineman, and defendant-employer made modifications to the job in order to assist plaintiff in this regard. *Page 6 
7. On 8 October 1991, Dr. Peterson wrote defendant-carrier in response to its inquiry as to whether plaintiff's care should be transferred to Charlotte and whether plaintiff had reached maximum medical improvement. In his correspondence of that date, Dr. Peterson indicated that it would be a while before plaintiff reached maximum medical improvement.
8. On 24 March 1992 Dr. Peterson again wrote defendant-employer and indicated that plaintiff needed a new prosthesis. Dr. Peterson also indicated in his correspondence from that date that plaintiff should continue to advance his activities and that he (Dr. Peterson) had approved a new job description.
9. On 1 October 1993, plaintiff returned to Dr. Peterson for a re-assessment. On that date, plaintiff reported experiencing problems with his prosthesis and a rash developing on his stump. It was again noted that every effort should be made to accommodate plaintiff's activity limitations and assist him in not overusing his prosthesis.
10. In 1994, defendant-employer determined that plaintiff could not overcome his limitations any longer. Therefore, although defendant-employer had modified plaintiff's job from the time of his return to work, it was determined that plaintiff needed to move to a new position. Thereafter, on 1 April 1994, plaintiff changed jobs and began working for defendant-employer as a meter technician. According to the job description for this position, it involves working fifty percent (50%) of the time in the shop, the ability to work in adverse weather conditions, bending into awkward positions, ascending ladders, and moving up to eighty (80) pounds without assistance.
11. Plaintiff experienced difficulties performing the meter technician job, but as long as he was willing to attempt to perform it, defendant-employer was willing for him to continue *Page 7 
working in the position even though accommodations such as allowing someone else to climb the ladders and do the heavy lifting had to be made on a continuing basis.
12. Ms. Williams testified, and the Full Commission so finds, that defendant-employer would not have hired someone with plaintiff's physical limitations in the competitive marketplace to perform the modified jobs assigned to plaintiff following his return to work in November 1991. Ms. Williams further testified that she was not aware of any jobs with defendant-employer that plaintiff could perform that would be considered sedentary.
13. In 1993, plaintiff sought treatment from Dr. Culley C. Carson, III, a urologist with UNC-Hospitals, for erectile dysfunction resulting from his accident, and he was prescribed medication for this condition. While plaintiff was taking this medication, he developed unilateral hearing loss in the left ear. Plaintiff thought the medication had caused the hearing loss, and so he quit taking the medication. Dr. Carson explained that it was not likely the medication caused the hearing loss, but still this was what plaintiff believed.
14. On 16 October 1995, plaintiff returned to UNC Health Care and reported experiencing left hip and back pain. On that date it was noted that plaintiff had been performing lighter work and that he was taking Ibuprofen. At that time, Dr. Gary D. Bos in the Orthopaedic Clinic expressed that perhaps plaintiff should be retrained for a job that involved less walking.
15. On 6 March 1996, plaintiff returned to Dr. Bos, and reported continued problems with his left knee, left hip, back, as well as some left foot pain when walking. Initially at that time, it was thought that plaintiff had strained his back while expending great effort ambulating with his prosthesis. Also at that time, Dr. Bos believed plaintiff was working in a job that did not require as much ambulating as before, and therefore opined that plaintiff's hip pain and back pain were manageable. *Page 8 
16. Plaintiff filed an Industrial Commission Form 33 Request for Hearing on 10 September 1997 because defendant-carrier wanted plaintiff to execute an Industrial Commission Form 26 but would not adopt language in a proposed Form 26 Addendum. Through the Addendum, plaintiff sought to establish that he had only reached maximum medical improvement with regard to his left arm and right leg injuries. Dr. Peterson wrote a letter stating that plaintiff still had significant orthopedic problems and that he should not be rated for a while longer with regard to his left hip and back, impotence and urological problems.
17. Plaintiff filed a Form 18M from his orthopedic doctor and his urological doctor on 30 March 1998. On that form, plaintiff noted that "I continue to have pain and difficulty with my right leg, my left leg, my low back, my left shoulder, urological and genital system have been advised by my doctors that these injuries will require permanent medical treatment."
18. An Industrial Commission Form 25R was completed, and it reflected that plaintiff had a one hundred percent (100%) impairment to the right leg and twenty-five percent (25%) impairment to the left arm.
19. Dr. Bos wrote plaintiff's counsel on 14 May 1998 and indicated that plaintiff would need a new prosthesis every three years. Dr. Bos further indicated that plaintiff's back condition was going to be a lifelong problem but that it was doing better because he had decreased his activity. Dr. Bos also advised that plaintiff should perform mostly sedentary duty for the rest of his life due to his compensable injury and that if plaintiff resumed heavy activity, his back pain would become severe. Additionally, Dr. Bos noted that it was interesting that plaintiff liked to go to work everyday.
20. Deputy Commissioner Kim Cramer (now Ledford) entered an Opinion and Award on 27 June 2001 that awarded plaintiff compensation pursuant to N.C. Gen. Stat. § 97-31 for his *Page 9 
right leg and left arm, as well as lifetime medical treatment for his "back, hip and leg pain, urological problems and the periodic replacement of his prosthesis, and examination of his eyes." The parties thereafter entered a Consent Amendment to the Opinion and Award and added an additional conclusion of law to make it clear that plaintiff had not yet reached maximum medical improvement with regard to his back, left leg, left hip and sexual dysfunction.
21. Plaintiff continued working for defendant-employer to the best of his ability in the meter technician position. Then, in 2006, Ms. Williams started noticing that plaintiff was more withdrawn at work, and had begun reading his Bible during work hours and preaching to co-workers. Ms. Williams also began to notice strange behavior, with plaintiff being insubordinate at times, not attending meetings, remaining in his office, and not finishing his work. In addition, Ms. Williams started hearing reports from co-workers that plaintiff was having more pain complaints, even though he was not a complainer. Ms. Williams then had a discussion with defendant-carrier in 2006 about how long plaintiff would be able to continue working.
22. Plaintiff started receiving write-ups in 2007 because he was not going out in the field as much and because of his Bible reading in the shop. Plaintiff was eventually terminated on 21 March 2008. Plaintiff was not communicating at the time of his termination and was having psychological issues. When plaintiff went out of work, Ms. Williams contacted defendant-carrier to determine whether they were going to pay plaintiff benefits, and when it became apparent that this was not going to happen, she assisted plaintiff in completing his long-term disability application.
23. On 16 May 2008, Dr. Manning recommended that plaintiff see Dr. William Wilson for psychiatric treatment. Plaintiff's counsel sent this request to defendants on 29 May 2008, but the treatment was not approved. *Page 10 
24. On 19 May 2008, plaintiff sought treatment at Burch Chiropractic for left hip and knee pain. Dr. Burch indicated that plaintiff's gait alteration had resulted in spine and sacroiliac dysfunction and referred plaintiff to an orthopedic physician.
25. On 20 June 2008, plaintiff was examined by Dr. Rhyne at OrthoCarolina, at which time plaintiff related his back pain to his prosthetic related altered gait. Dr. Rhyne ordered an MRI of the back, and administered an injection that provided plaintiff partial relief. Dr. Rhyne reported that plaintiff did not want to consider surgery. Plaintiff discussed various other treatment options with Dr. Rhyne, and Dr. Rhyne said that plaintiff would have to talk to his adjuster about those options. Dr. Rhyne also noted that plaintiff would remain out of work and follow up with him in the future.
26. On 31 July 2008, plaintiff sought psychological treatment from Dr. Walton at Carolina Behavioral. Plaintiff was vague about why he was there and was focused almost exclusively on his relationship with God. It was noted that plaintiff laughed inappropriately, and his wife had to provide Dr. Walton his medical and psychological history. Dr. Walton then referred plaintiff for a psychiatric assessment.
27. Due to plaintiff's failure to voluntarily make himself available for and to comply with medical treatment, plaintiff's brother involuntarily committed plaintiff to Holly Hill Hospital on 9 September 2008. Dr. Joseph R. Mazzaglia, a psychiatrist, treated plaintiff at Holly Hill and believed that plaintiff suffered from a psychotic affective disorder with manic features. Dr. Mazzaglia also believed that plaintiff was in total denial about there being an illness. Also while at Holly Hill, it was noted that plaintiff had also used sexually inappropriate language in church and that he was refusing to voluntarily attend his medical appointments. Upon being hospitalized, plaintiff also refused to take his medication. It was further noted that plaintiff was *Page 11 
experiencing an increased psychosis and increased isolative behavior, just wanting to read his Bible, and that he had a violent outburst toward a peer.
28. Thereafter, plaintiff eventually agreed to start taking his oral medications. Despite this development, plaintiff's wife was initially concerned about his discharge from Holly Hill because she was scared that he would discontinue taking his medications and would continue to be abusive. Later, plaintiff's wife became more comfortable regarding plaintiff agreeing to take his medications, attend his medical appointments, and do what was necessary to take care of himself. Plaintiff was thereafter discharged from Holly Hill after approximately ten (10) days of hospitalization.
29. On 25 September 2008, plaintiff sought additional psychological treatment from Dr. Jonathan Stoudmire, a psychiatrist. On that date, plaintiff discussed his life and his various stressors in detail with Dr. Stoudmire and received recommendations for improving his stress level and his marriage.
30. Plaintiff filed a second Industrial Commission Form 33 on 31 July 2009 seeking payment of indemnity compensation and additional medical treatment. Defendants then filed an Industrial Commission Form 33R denying the compensability of plaintiff's psychological condition and denying his entitlement to indemnity compensation. Defendants also denied the compensability of additional treatment for plaintiff's back condition.
31. Dr. Mazzaglia testified in this matter as an expert in the field of psychiatry. Prior to offering opinions during his deposition, Dr. Mazzaglia reviewed the transcript of the 2010 hearing before the Deputy Commissioner. Dr. Mazzaglia testified that the history of a patient is important and that reviewing the hearing transcript helped him because it gave him some *Page 12 
longitudinal perspective on plaintiff's situation, which was important because plaintiff was not comfortable talking with him and was not comfortable with self-disclosure.
32. Dr. Mazzaglia believed that plaintiff had aligned himself with God in order to be able to deal with his situation. Dr. Mazzaglia could see in plaintiff the evolution of a man who did not complain but that was becoming depressed because of his demotions in work. To Dr. Mazzaglia, plaintiff was someone who identified himself as a physically stable, healthy person, and he lost that after his injury. According to Dr. Mazzaglia the sicker plaintiff became, the less he was able to reconcile the physical limitations of his illness, which made him more depressed. The religiosity helped soothe or ease plaintiff's mind about things.
33. Dr. Mazzaglia testified that Plaintiff's depression was caused by his "collective loss of his own sense of person, physically, sexually, I believe the function as a provider and a competent worker." Dr. Mazzaglia further elaborated:
 "Again, just this constant buildup of things where he got to a point that he was no longer resolving in his mind, I can get by this, I can get through it, I can do what I have to do, because finally there was just the incontrovertible fact, I can't function. At least physically."
With regard to the role that Plaintiff's accident played in the development of his psychological condition, Dr. Mazzaglia testified:
 "I think there's a direct connection. But for that injury, I could not say that he couldn't have been depressed or suffer something subsequently during the following two decades, but of the magnitude of this and to the extent of the symptoms that he's presented with, not likely."
34. Dr. Karla de Beck also testified as an expert in the field of psychiatry, but her testimony is given less weight than that of Dr. Mazzaglia because she has never met plaintiff or his wife personally and only reviewed some of his medical records. Additionally, Dr. de Beck *Page 13 
did not review the hearing testimony as Dr. Mazzaglia did, and was not aware that plaintiff's accident caused him to have sexual dysfunction.
35. Based upon the preponderance of the evidence in view of the entire record, particularly the testimony of Dr. Mazzaglia, the Full Commission finds that plaintiff's psychological condition is the direct and natural result of and causally related to his 10 August 1990 injury by accident.
36. Dr. Rhyne testified as an expert in the field of orthopedics. Like Dr. Bos, he thought that plaintiff's back pain and leg pain had come from plaintiff ambulating with his prosthesis. Dr. Rhyne agreed that plaintiff should be in a profession that requires little to no ambulation, that he should consider retraining, and that he should not be doing medium-duty work. Dr. Rhyne rated plaintiff's physical capacity as light-sedentary and recommended that plaintiff go to the Charlotte Institute of Rehabilitation to treat with a physiatrist.
37. Defendants did not present any evidence to show that plaintiff's continuing back and left leg complaints were not related to his 10 August 1990 injury by accident.
38. Based upon the preponderance of the evidence in view of the entire record, the Full Commission finds that plaintiff's continuing back and left leg complaints are the direct and natural result of and causally related to his 10 August 1990 injury by accident.
39. Based upon the preponderance of the evidence in view of the entire record, the Full Commission finds that plaintiff had been working in a modified job that exceeded his work restrictions for a number of years before he was terminated. In addition, as stated above, defendant-employer would not have hired someone in the competitive marketplace to do the modified jobs performed by plaintiff. *Page 14 
40. Plaintiff has not yet reached maximum medical improvement with regard to all of his compensable injuries, including his depression and his back. Plaintiff is also in need of the assistance of vocational rehabilitation, and possible retraining, to assist him in returning to suitable employment. Without such assistance, it is futile for plaintiff to attempt to return to work.
41. However, based upon the preponderance of the evidence in view of the entire record, the Full Commission finds that no vocational rehabilitation efforts should be undertaken until plaintiff completes the recommended treatment with a physiatrist at the Charlotte Institute of Rehabilitation, and such efforts are approved by the authorized physician treating plaintiff for his physical condition as well as the authorized physician treating plaintiff for his psychological condition.
42. Defendants' defense of this matter was unreasonable and indicative of stubborn, unfounded litigiousness which entitles plaintiff to attorney's fees as a sanction pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Stipulations and Findings of Fact and upon the preponderance of the evidence in view of the entire record, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on 10 August 1990 when he came in contact with a live electrical line in the course and scope of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of his admittedly compensable accident, the Industrial Commission previously determined in a 2001 Opinion and Award that plaintiff is entitled to lifetime medical *Page 15 
treatment for his "back, hip and leg pain, urological problems and the periodic replacement of his prosthesis, and examination of his eyes." Therefore, plaintiff is entitled to a presumption that medical treatment currently needed for his back and left leg is causally related to his 10 August 1990 injury by accident. SeeParsons v. Pantry, 126 N.C. App. 540, 485 S.E.2d 867 (1997). Defendants have failed to present any evidence to rebut this presumption with regard to plaintiff's back or left leg.Id.
3. Based upon the preponderance of the evidence in view of the entire record, the Full Commission concludes that plaintiff's psychological condition is the direct and natural result of and causally related to his 10 August 1990 injury by accident. N.C. Gen. Stat. § 97-2(6); Click v. Pilot Freight Carriers,Inc., 300 N.C. 164, 265 S.E. 2d 389 (1980); Holley v. ACTS,Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Young v. HickoryBus. Furn., 353 N.C. 227, 538 S.E.2d 912 (2000).
4. Plaintiff's work with defendant-employer following his 10 August 1990 injury by accident but prior to his termination on 18 March 2008 was not suitable employment because without accommodations and modifications it was not compatible with plaintiff's limitations from his admittedly compensable injuries. Additionally, the modified job plaintiff performed was not suitable because it was not available in the competitive marketplace. Saums v. Raleigh Community Hospital,346 NC 760, 487 S.E.2d 747 (1997). Peoples v. Cone MillsCorp., 316 N.C. 426, 342 S.E.2d 798, (1986). Therefore, plaintiff's termination was not a constructive refusal of suitable employment, and plaintiff is entitled to temporary total disability compensation at the rate of $331.04 per week from the date of termination on 18 March 2008 through the present and continuing until such time as he returns to work, or further Order of the Commission. N.C. Gen. Stat. § 97-29. *Page 16 
5. Based upon the preponderance of the evidence in view of the entire record, the Full Commission concludes that no vocational rehabilitation efforts should be undertaken until plaintiff completes the recommended treatment with a physiatrist at the Charlotte Institute of Rehabilitation, and such efforts are approved by the authorized physician treating plaintiff for his physical condition as well as the authorized physician treating plaintiff for his psychological condition. N.C. Gen. Stat. § 97-29.
6. As the result of his 10 August 1990 admittedly compensable injury by accident and causally related ongoing back and left leg conditions, and his causally related psychological condition, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, including treatment for his psychological condition, back, and left leg as provided by Holly Hill Hospital, Dr. Mazzaglia and Dr. Stoudmire, as well as the treatment to be provided at the Charlotte Institute of Rehabilitation, subject to the provisions of N.C. Gen Stat. § 97-25.1, when the medical bills have been approved according to established Industrial Commission procedures. N.C. Gen Stat. §§ 97-25; 97-25.1.
7. Because defendants' defense of this matter was unreasonable and indicative of stubborn, unfounded litigiousness, plaintiff is entitled to attorney's fees as a sanction pursuant to N.C. Gen. Stat. § 97-88.1, which shall be calculated after plaintiff's counsel submits an affidavit regarding the hours worked prosecuting this matter before Deputy Commissioner Baddour and a requested hourly rate.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the undersigned enters the following: *Page 17 
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at the rate of $331.04 per week for the period of 18 March 2008 through the present and continuing until such time as he returns to work, or further Order of the Commission. From the amounts having accrued, this shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of his 10 August 1990 admittedly compensable injury by accident and causally related ongoing back and left leg conditions, and his causally related psychological condition, including treatment for his psychological condition, back, and left leg as provided by Holly Hill Hospital, Dr. Mazzaglia and Dr. Stoudmire, as well as the treatment to be provided at the Charlotte Institute of Rehabilitation, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when the medical bills have been approved according to established Industrial Commission procedures.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel in one lump sum of the accrued amount due plaintiff and thereafter by deducting every fourth compensation check due plaintiff.
4. Upon receipt of an affidavit regarding the hours worked prosecuting this matter before Deputy Commissioner Baddour and a requested hourly rate, a reasonable attorney's fee as a sanction pursuant to N.C. Gen. Stat. § 97-88.1, shall be awarded to plaintiff's counsel.
5. Defendants shall pay the costs due the Commission. *Page 18 
IT IS THEREFORE ORDERED that this matter shall be REMOVED from the Full Commission level hearing docket.
This the ___ day of _____ 2011.
 S/_____________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________________ LINDA CHEATHAM COMMISSIONER
 S/_____________________ TAMMY R. NANCE COMMISSIONER *Page 1